**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TRACIE JEFFERY, o.b.o. V.J., | ) | |
| | ) | CASE NO.  1:13CV1778 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | MAGISTRATE JUDGE GREG WHITE |
| Security, | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff Tracie Jeffery ("Jeffery"), on behalf of her minor daughter, V.J., challenges the final decision of the Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner"), denying V.J.'s claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case is REMANDED.

## I.  Procedural History

On September 14, 2010, Jeffery filed an application for SSI on behalf of her daughter V.J., a child under the age of eighteen, alleging a disability onset date of May 1, 2009 and

claiming V.J. was disabled due to Attention Deficit/Hyperactivity Disorder ("ADHD") and a learning disability.  (Tr. 108-111, 128.)  The application was denied both initially and upon reconsideration.  (Tr. 74-76, 80-82.)  Jeffery timely requested an administrative hearing.  (Tr. 83-85.)

On February 9, 2012, an Administrative Law Judge ("ALJ") held a hearing during which V.J., represented by counsel, and Jeffery testified.  (Tr. 25-48.)  On March 16, 2012, the ALJ found V.J. did not have an impairment or combination of impairments that met or functionally equaled the listings.  (Tr. 11-20.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-4.)

## II. Evidence

### Personal Evidence

V.J. was born in April 2001, and was a ten year old "school-age" child pursuant to 20 CFR § 416.926a(g)(2)(iv) at the time of the administrative hearing.  (Tr. 14, 32.)

### School Records and Medical Evidence

In March 2009, when V.J. was in second grade, the Berea School District proposed to complete an initial evaluation for an Individualized Education Program ("IEP") because "[d]espite on-going and sequentially more intensive interventions, [V.J.'s] academic skills in reading, spelling, math, and written expression fall significantly below grade level." (Tr. 240.) Jeffery consented and, in April 2009, V.J. underwent two tests: the Wechsler Intelligence Scale for Children- Fourth Edition ("WISC-IV") and the Woodcock- Johnson Tests of Achievement-III ("WJ-III").  (Tr. 245-246, 254-256.)

While taking the WISC-IV, V.J. was observed to be a "polite, friendly and verbal

2

youngster." (Tr. 245.)  School psychologist Rose Newsad-See noted that "[i]mpulsive and overactive behaviors were observed throughout this evaluation (i.e. fidgety, squirmy, tipping chair, rocking back and forth, squatting or kneeling on chair while completing tasks)." (Tr. 245.) However, she remarked that V.J. nevertheless "remained remarkably attentive and focused to tasks presented in the individual assessment setting." (Tr. 245.)  The WISC-IV results demonstrated V.J. had borderline verbal comprehension;[1] low average perceptual reasoning and working memory; and, a Full Scale IQ of 80. (Tr. 245.)  Noting that V.J.'s "nonverbal reasoning abilities are much better developed than her verbal reasoning abilities," Ms. Newsad-See found that "[V.J.'s] unique set of thinking and reasoning abilities make her overall intellectual functioning difficult to summarize by a single score on the WISC-IV." (Tr. 246.)

With respect to the WJ-III, V.J. demonstrated "low average" skills in basic reading, math reasoning, written expression and academic fluency. (Tr. 254.)  She also exhibited low reading comprehension, placing in the 5th percentile as compared to her peers. (Tr. 254.)  With regard to her reading comprehension, Ms. Newsad-See specifically noted V.J.'s "skills here were estimated to be over a year below grade level in development." (Tr. 254.)

In addition to concerns regarding her academic functioning, teacher evaluations submitted as part of the initial evaluation process reflect concern about V.J.'s ability to focus and maintain attention. (Tr. 247, 250, 253, 266.)  Intervention Specialist, Lauren Delgado, for example, noted V.J. "does have a difficult time staying on task" and "is easily distracted by what is going on around her." (Tr. 253.)  V.J.'s tutor, Heather Rodgers, also observed that, while V.J.

---

[1]  V.J.'s verbal comprehension abilities were measured to be in the "Borderline Range." (Tr. 245.) Specifically, V.J. scored in the 4th percentile as compared to her peers. (Tr. 245.)

3

sometimes focuses appropriately, she "frequently becomes disconnected from her work and the rest of the group and becomes frustrated and emotional quickly." (Tr. 250.)  These concerns are further reflected in a Teacher Report Form ("TRF") completed by Ms. Delgado regarding V.J.'s social, emotional, and behavioral status. (Tr. 259-260.)  Ms. Delgado scored V.J. in a variety of social and emotional areas, with scores above 65 indicating "significant problematic behavior." (Tr. 259.)  V.J. scored a 78 as to "attention problems;" a 69 as to rule breaking behavior; and, a 65 on both "social problems" and aggressive behavior. (Tr. 259.)  She also scored a 74 in the category of "attention deficit/hyperactivity problems." (Tr. 260.)

   Ms. Newsad-See and the initial evaluation team concluded V.J. had a "Specific Learning Disability." (Tr. 270.)  They noted she "has significant difficulty staying on task and following directions;" described her effort as inconsistent; and, found her to be "easily distracted by activity around her." (Tr. 260, 267.)  The evaluation team also observed that:

> School Behavioral rating results indicate clinical concern with [V.J.'s] Externalizing behaviors. . . Her score on the Attention Problems (i.e. fails to finish things she starts, cannot pay attention/concentrate for long, has difficulty following directions, is inattentive and easily distracted, fails to carry out assigned tasks, cannot sit still, fidgets, disturbs other pupils, acts impulsively, talks out of turn, talks excessively, and is unusually loud) syndrome was in the clinical range. Her scores on the Social Problems, Rule-Breaking Behavior, and Aggressive Behavior Syndromes were in the borderline clinical range.  On the Attention Problems subscales, [V.J.'s] scores for both Inattention and Hyperactivity-Impulsivity were high enough to warrant concern.  Direct classroom observational data revealed on-task behavior occurring 77% of the time.
>
> * * *
>
> Given noted and significant concern with attention problems, [V.J.] needs to be seated near instruction.  She needs frequent direction and redirection with work completion.  She needs to be closely monitored in the classroom in order to support her academic success.  She needs extended time as well as breaks provided to complete sustained effort tasks.  She may need firm limits specified in a classroom behavior plan, which targets goals to increase her independent work

4

completion and accuracy, and develop self-monitoring/accountability skills (for task completion accuracy, following directions).

(Tr. 267-268.)  Finally, the evaluation team found that V.J. qualified for speech therapy, as she scored "below average" or "poor" in a number of categories on the Test of Language Development-Primary, including her overall verbal language skills; ability to organize her thoughts, ideas, and sentence word order; and, ability to get her thoughts and ideas across to others.  (Tr. 257-258.)

In May 2009, V.J.'s school implemented an IEP consistent with the above evaluation. (Tr. 221-237.)  This IEP noted "classroom observation of [V.J.] indicates that she has significant difficulty staying on task and following directions" and is "easily distracted."  (Tr. 222.)  It specified V.J. would be provided with services from a speech therapist and intervention specialist, as well as her regular education teacher.  (Tr. 223.)  The IEP also indicated V.J. would be given accommodations for state and district wide testing in reading and math.  (Tr. 236.)

In August 2009, speech therapist Deborah Miller completed a questionnaire for the Bureau of Disability.  (Tr. 143-144.)  Therein, Ms. Miller noted V.J. produced all speech sounds correctly and her "articulation skills are within normal limits."  (Tr. 143.)  However, she indicated V.J.'s "language skills, both expressive and receptive, are delayed."  (Tr. 143.)  She observed "[i]t is difficult for [V.J.] to get her thoughts and ideas across to others verbally" and stated her "language delay causes her difficulty comprehending what she has read, and following directions of her teachers and family."  (Tr. 144.)

In March 2010, when V.J. was in third grade, her verbal language skills were again assessed using the Test of Language Development- Primary.  (Tr. 335.)  V.J. again scored "below average" or "poor" in a number of categories, including her overall language skills;

5

ability to focus and listen to the verbal language of others; ability to organize her thoughts, ideas, and word ordering in her verbal language; and, ability to get her thoughts and ideas across to others verbally. (Tr. 335.) In the first annual review of her IEP, V.J.'s school concluded she continued to require the assistance of a speech therapist, as well as services from an intervention specialist with regard to her reading, math and written communication skills. (Tr. 335-346.)

In October 2010, when V.J. was in the fourth grade, her intervention specialist, Julie Bodman, completed a Teacher Questionnaire. (Tr. 164-173.) She indicated she had seen V.J. for two hours a day, five days a week, for the past three months. (Tr. 164.) Although V.J. was in the fourth grade, Ms. Bodman stated she was functioning at a third grade level in reading, math, and written language, despite being provided with special education services for 300 minutes per week in reading, 300 minutes per week in math, and 225 minutes per week in writing. (Tr. 164.) With regard to the domain of attending and completing tasks, Ms. Bodman noted V.J. had an "obvious problem" in the following categories: (1) paying attention when spoken to directly; (2) focusing long enough to finish assigned activity or task; (3) carry out multi-step instructions; (4) organizing own things or school materials; (5) completing work accurately without careless mistakes; and, (6) working without distracting self or others. (Tr. 166.) She also noted V.J. had a "slight problem" with (1) sustaining attention during play/sports activities; (2) refocusing to task when necessary; (3) changing from one activity to another without being disruptive; (4) completing class/homeroom assignments; and, (5) working at reasonable pace/finishing on time. (Tr. 166.) In hand-written comments, Ms. Bodman specifically noted that V.J. "is easily distracted by her peers." (Tr. 165.)

With regard to the domain of interacting and relating with others, Ms. Bodman found

6

V.J. had an "obvious problem" in the following categories: (1) seeking attention appropriately; (2) expressing anger appropriately; (3) introducing and maintaining relevant and appropriate topics of conversation; (4) taking turns in a conversation; and, (5) using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation.  (Tr. 167.)  She also indicated V.J. had a "slight problem" with respect to: (1) asking permission appropriately; (2) following rules (classroom, games, sports); (3) respecting/obeying adults in authority; and, (4) relating experiences and telling stories.  (Tr. 167.)  In hand-written comments, Ms. Bodeman noted V.J. "is sexual in her conversations with peers.  She is also known to lie."[2]  (Tr. 167.)

In February 2011, V.J.'s verbal language skills were assessed using the Test of Language Development- Intermediate.  (Tr. 402.)  V.J. scored "below average" or "poor" in a number of categories, including her overall language skills; ability to focus and listen to the verbal language of others; and, ability to get her thoughts and ideas across to others verbally.  (Tr. 402.)  In its second annual review of her IEP, V.J.'s school concluded she continued to require the assistance of a speech therapist, as well as services from an intervention specialist with regard to her reading, math and written communication skills.  (Tr. 411.)

Ms. Bodman completed another Teacher Questionnaire in April 2011, near the end of V.J.'s fourth grade school year and after she had been working with V.J. for nine months.  (Tr. 391-398.)  In this Questionnaire, Ms. Bodman indicated V.J. was functioning at a second grade

---

[2]  With regard to the domain of acquiring and using information, Ms. Bodman found V.J. had an "obvious problem" in the categories of (1) comprehending and doing math problems; (2) providing organized oral explanations and adequate descriptions; (3) expressing ideas in written form; (4) learning new material; and, (5) recalling and applying previously learned material.  (Tr. 165.)  Ms. Bodman indicated V.J. had no problems in the domains of moving about and manipulating objects, and caring for oneself.  (Tr. 168-169.)

level in reading and a third grade level in math.  (Tr. 391.)  In the domain of attending and completing tasks, Ms. Bodman found V.J. had worsened since the October 2010, concluding she had a "serious problem" in the categories of: (1) focusing long enough to finish assigned activity or task; (2) refocusing to task when necessary; (3) carrying out multi-step instructions; (4) waiting to take turns; (5) changing from one activity to another without being disruptive; (6) completing class/homework assignments; (7) completing work accurately without careless mistakes; (8) working without distracting self or others; and, (9) working at a reasonable pace/finishing on time.  (Tr. 393.)  She also found V.J. had an "obvious problem" with: (1) carrying out single-step instructions; and, (2) organizing own things or school materials.  (Tr. 393.)  In hand-written comments, Ms. Bodman noted V.J. "is easily distracted and hard to refocus" and, further, that she "has a hard time staying on task and staying focused on her work." (Tr. 392-393.)

Ms. Bodman also noted worsening in the domain of interacting and relating with others since completing the October 2010 Questionnaire.  Regarding this domain, she indicated V.J. has a "very serious problem" in seeking attention appropriately.  (Tr. 394.)  She also found V.J. has a "serious problem" in the following categories: (1) playing cooperatively with others; (2) following rules (classroom, games, sports); (3) respecting/obeying adults in authority; and, (4) using language appropriate to the situation and listener.  (Tr. 394.)  Ms. Bodman further noted V.J. has an "obvious problem" with respect to: (1) making and keeping friends; (2) expressing anger appropriately; (3) asking permission appropriately; and, (4) relating experiences and telling stories. (Tr. 394.)  Ms. Bodman also wrote that V.J. "still has temper tantrums" and

8

"continues to lie."[3]  (Tr. 394.)

V.J. moved to the Parma School District for the 2011-2012 school year.  (Tr. 461.)  In September 2011, she was administered articulation and language assessments.  (Tr. 461.)  Although she showed strength in the area of articulation, V.J.'s language scores fell below the range expected for typical same-age peers.  (Tr. 462.)  In terms of her reading and math functioning, V.J. was found to fall significantly below the benchmarks for typical fifth graders, with her scores sometimes falling below not only the average score for fifth graders but also the average score for students with disability.  (Tr. 462, 463.)  She was also again administered the WJ-III, where she scored below average in both math and writing.  (Tr. 462-463.)  The IEP team noted that V.J. "is working on organizing her school work and remembering to complete and return unfinished and/or assigned work."  (Tr. 463.)  It was also noted that "Mom is concerned about her attention. She feels that she is missing a lot because she cannot focus on what is going on in class." (Tr. 463.)  The team concluded V.J. continued to require the assistance of a speech therapist, as well as services from an intervention specialist with regard to her reading, math and written communication skills.  (Tr. 476-477.)

In December 2011, Kathleen Haverdill (V.J.'s fifth grade teacher) completed a Teacher Questionnaire.  (Tr. 214-217.)   Therein, Ms. Haverdill noted the following concerns:

- "[V.J.] struggles in all academic areas. She is able to do the work with a lot of

---

[3] With regard to the domain of acquiring and using information, Ms. Bodman found V.J. had an "obvious problem" in the categories of (1) reading and comprehending written material; (2) comprehending and doing math problems; (3) expressing ideas in written form; (4) learning new material; (5) recalling and applying previously learned material; and, (6) applying problem- solving skills in class discussions.  (Tr. 392.)  Ms. Bodman indicated V.J. had no problems in the domains of moving about and manipulating objects, and caring for oneself. (Tr. 395-396.)

small group/one on one help.  She also struggles with retaining information."

- "[V.J.] needs numerous reminders to keep working and refocus.  She is off task quite often.  She works slow and requires additional time to complete tasks.  Attention and focus are big inhibitors to [V.J.]"

- "[V.J.] has difficulty getting along with peers and has a hard time working cooperatively in group situations.  She is very argumentative and often wants to direct her group's attention elsewhere."

- "[V.J.] will often throw 'tantrums' when she doesn't get her own way.  Her moods can change quickly."

- [V.J.]'s "primary problems" are completion of assignments; and focus and attention.

(Tr. 214-217.)  It is somewhat difficult to read, but V.J.'s report card for the second quarter of her fifth grade year appears to show an F in reading; F in writing; D+ in spelling; F in social studies; F in math; and D in science.  (Tr. 488.)

Meanwhile, in January 2011, V.J. underwent a consultative examination with David House, Ph.D.  (Tr. 383-387.)  Jeffery reported V.J. "generally gets along okay with others, although there are occasional fights."  (Tr. 384.)  She also reported daily tantrums consisting of screaming, crying, and throwing things.  (Tr. 384.)  Jeffery indicated V.J. had been diagnosed as hyperactive and took medication, but that she forgot to give V.J. her medication that day.  (Tr. 385.)  Jeffery also reported V.J.'s grades were "decent" and she had never repeated a grade.  (Tr. 385.)  Although V.J. had received detention and Jeffery had gotten calls from the school about lying and "acting out," V.J. had never been suspended.  (Tr. 385.)

On examination, Dr. House noted V.J.'s "[c]oncentration and attention appear seriously limited," although her pace was adequate and she "was persistent and did try to complete the examiner's tasks."  (Tr. 386.)  V.J. reported to Dr. House that she had an imaginary friend named

10

Emily, who had been with her "since birth." (Tr. 386.)  Dr. House diagnosed Attention

Deficit/Hyperactivity Disorder and Psychotic Disorder, Not Otherwise Specified.  (Tr. 387.)  He

concluded that V.J.'s concentration and attention appeared to be 2/3 of average functioning for a

child her age; while her pace, persistence and task completion appeared to be 3/4 of average

functioning for a child her age. (Tr. 387.)  In addition, he found her "social, emotional and

behavior patterns appear to be ½ of average functioning for a child her age, based on excessive

fantasy material;" i.e. her imaginary friend. (Tr. 387.)   He also noted V.J.'s "speech is 2/3 of

average functioning for a child her age in terms of language usage, but 3/4 of average

functioning for a child her age in terms of clarity." (Tr. 387.)

    Dr. House assessed a Global Assessment of Functioning ("GAF") of 40.[4]  (Tr. 388.)  He

stated "[t]he GAF is based on at least some impairment in reality testing for a nine year old.

Functionally, she presents with serious levels of impairment in terms of socialization, primarily

revolving around the issue of dealing with fantasy."  (Tr. 388.)

    In February 2011, state agency physicians John L. Mormol, M.D., and Caroline Lewin,

Ph.D., reviewed V.J.'s records and completed a Disability Determination Explanation. (Tr. 50-

58.)  Drs. Mormol and Lewin concluded V.J. had a "severe" impairment (ADHD) but that it did

not meet, medically equal, or functionally equal a listed impairment.  (Tr. 53-55.)  Specifically,

---

[4]  The GAF scale reports a clinician's assessment of an individual's overall level of
functioning.  *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American
Psychiatric Association, 4th ed revised, 2000) ("DSM-IV").  An individual's GAF is rated
between 0 - 100, with lower numbers indicating more severe mental impairments. A GAF score
between 0 - 50 indicates serious symptoms or any serious impairment in social, occupational or
social functioning.  DSM-IV at 34.  It bears noting, however, that a recent update of the DSM
eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable
psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders*
(DSM-5) at 16 (American Psychiatric Association, 5th ed., 2013).

Drs. Mormol and Lewin found V.J. has less than marked limitations in acquiring and using

information, attending and completing tasks, and interacting and relating to others; and, no

limitations in caring for herself, moving about and manipulating objects, and health and physical

well-being.  (Tr. 54-55.)  In so finding, these doctors acknowledged Dr. House's concern

regarding V.J.'s imaginary friend, but found "this is not age inappropriate and NOT a sign of

psychosis in a child although it would be for an adult."  (Tr. 55.)  In June 2011, state agency

physicians Malika Haque, M.D., and Paul Tangeman, Ph.D., reviewed V.J.'s records and came

to the same conclusions as Drs. Mormol and Lewin.  (Tr. 65-66.)

***Hearing Testimony***

      During the hearing, Jeffery testified as follows:

- It is difficult to get V.J. to do her homework.  She often has to fight and argue with V.J. to keep her focused.  V.J. sometimes wants Jeffery to do the homework for her.  When Jeffery explains what V.J. needs to do, V.J. gets angry and tells her she is wrong.  In the past, she has gotten calls from the school that V.J. was fighting, not doing her homework, talking back to her teachers, and getting angry.  V.J. has never been suspended, but she has been put on detention for missing assignments and fighting.  (Tr. 38-40, 43.)

- She sometimes has to fight with V.J. to get her to take her ADHD medication.  On one occasion, V.J. held a Concerta pill in her mouth for 45 minutes.  The doctor then prescribed liquid Ritalin, which V.J. took for awhile but then "started saying it was nasty."  V.J. takes her medication "on and off."   She does not see much of a change even when V.J. does take her medication.  She is trying to get an appointment with a psychiatrist to help adjust V.J.'s medications. (Tr. 33-34, 40.)

- V.J. has temper tantrums every day during which she slams the door, throws things, screams and yells, and slams herself to the ground.  V.J. has broken some of her things during a tantrum, but that does not always happen.  V.J. has a tantrum anytime Jeffery tells her no or asks her to do something.  She "can't ask [V.J.] to do anything because 99 percent of the time she just like flies off the handle." (Tr. 36, 41-42.)

- V.J. does not have any friends right now.  Sometimes V.J. will go to a neighborhood friend's house but V.J. "will get mad at her for something that she

12

did or vice versa and then it just ends into a big argument." (Tr. 40.)  V.J. also nitpicks and fights with her brothers.  Sometimes they get along, but "she likes to lie and say they do everything."  (Tr. 40.)

- V.J. told consultative examiner Dr. House that she had an imaginary friend.  Prior to this examination, Jeffery never heard V.J. talk about an imaginary friend.  Since then, V.J. has talked about it periodically.  (Tr. 35.)

The ALJ also asked V.J. questions during the hearing. V.J. testified as follows:

- She told Dr. House that she had an imaginary friend because she does.  She is the only one that sees her.  She knows that her imaginary friend is not real. (Tr. 44.)

- She got in trouble at school because she threatened to kill herself and threatened to kill somebody.  She was "mostly being mean." A boy at school had called her "really mean names" and she got really angry and "start[ed] saying stuff."  She did not really mean it when she said she was going to kill herself. (Tr. 45-47.)

### III.  Standard for Disability

To qualify for SSI benefits, an individual must demonstrate a disability as defined under the Act.  "An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process.  20 C.F.R. § 416.924(a).  At step one, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At step two, a child must suffer from a "severe impairment."  20 C.F.R. § 416.924(c).  At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

13

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment.  20 C.F.R. § 416.926a(a).  The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled.  20 C.F.R. § 416.926a(d).  To receive SSI benefits, a child recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning.  20 C.F.R. § 416.926a(e)(2)(i).  "Marked" limitation means "more than moderate" but "less than extreme."  20 C.F.R. § 416.926a(e)(2)(i).  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id*.

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked."  20 C.F.R. § 416.926a(e)(3)(i).  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id*.

If an impairment is found to meet, or qualify as the medical or functional equivalent of a listed disability and the twelve-month durational requirement is satisfied, the claimant will be

deemed disabled. 20 C.F.R. § 416.924(d)(1).

## IV. Summary of Commissioner's Decision

The ALJ made the following findings regarding V.J. in the March 16, 2012 decision:

1. The claimant was born on April 17, 2001. Therefore, she was a school-age child on September 3, 2010, the date [the] application was filed, and is currently a school-age child (20 CFR 416.926(g)(2)).

2. The claimant has not engaged in substantial gainful activity since September 3, 2010, the application date (20 CFR 416.924(b) and 416.971 et seq.)

3. The claimant has the following severe impairments: ADHD and Learning Disability (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926(a)).

6. The claimant has not been disabled, as defined in the Social Security Act, since September 3, 2010, the date the application was filed (20 CFR 416.924(a)).

(Tr. 11-20.) The ALJ found that V.J. had less than marked limitations in the following three domains: acquiring and using information; attending and completing tasks; and, interacting and relating with others. (Tr. 15-18.) He further found V.J. had no limitations in the remaining domains of moving about and manipulating objects; caring for oneself; and, health and physical well-being. (Tr. 18-20.)

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the

15

record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

16

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence

in the record to support the decision, [where] the reasons given by the trier of fact do not build an

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.

Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996);

*accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is

not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

*McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL

2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9,

2010).

## VI.  Analysis

Jeffery argues the ALJ erred in finding that V.J.'s severe impairments are not functionally

equivalent to a listed impairment.  She claims substantial evidence supports a finding that V.J.

has marked limitations in the domains of attending and completing tasks, and interacting and

relating with others.  Jeffery believes that, with respect to both of these domains, the ALJ's

analysis was inadequate because it failed to fully consider either the hearing testimony, or the

Teacher Questionnaires submitted by Ms. Bodman and Ms. Haverdill.  (Doc. No. 14 at 8-11.)

The Commissioner acknowledges that assessments from V.J.'s teachers indicate

limitations in V.J.'s abilities in attending/completing tasks and interacting/relating with others,

17

but maintains substantial evidence exists in the record to support the conclusion that V.J. is not limited "to a marked degree." (Doc. No. 17 at 11-16.)

To functionally equal the listings, an impairment(s) must be of listing-level severity; i.e. it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *See* 20 C.F.R. §416.926a(a); Social Security Ruling ("SSR") 09-1p (March 19, 2009). In determining whether a child has a "marked" or "extreme" limitation, the Agency will:

> . . . consider your functional limitations resulting from all of your impairments, including their interactive and cumulative effects. We will consider all the relevant information in your case record that helps us determine your functioning, including your signs, symptoms, and laboratory findings, the descriptions we have about your functioning from your parents, teachers, and other people who know you, and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929.

20 C.F.R. § 926a(e). The factors set forth in §§ 416.924a, 416.924b, and 416.929 include, but are not limited to the following: how well a child can initiate and sustain activities; how much extra help a child needs; the effects of structured or support settings; how a child functions in school; and, the effects of medications or other treatment. *See* 20 C.F.R. § 416.926a(a). In determining whether a child functionally equals a listing, ALJs need not discuss all of the considerations set forth in 20 C.F.R. § 926a and SSR 09-1p; however, they must "provide sufficient detail so that any subsequent reviewers can understand how they made their findings." SSR 09-1p.[5]

---

[5] In assessing functional equivalence, the Agency employs a "whole child" approach. Under this approach, "[w]e focus first on the child's activities, and evaluate how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments. 20 CFR 416.926a(b) and (c). We consider what activities the child cannot do, has difficulty doing, needs help doing, or is restricted from doing because of the impairments. 20 CFR 416.926a(a). Activities are everything a child does at home, at school, and in the community, 24 hours a day, 7 days a week." SSR 09-2p. The Agency next evaluates the effects of a child's impairments by rating the degree to which the impairment(s)

***Attending and Completing Tasks***

The domain of attending and completing tasks considers "how well [the child is] able to focus and maintain [her] attention, and how well [she] begin[s], carr[ies] through, and finish[es] [her] activities, including the pace at which [she] perform[s] activities and the ease with which [she] change[s] them." 20 C.F.R. § 416.926a(h). With regard to school age children such as V.J., the Agency considers a child's functioning in this domain in the following context:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodations.

20 C.F.R. § 416.926a(h)(2)(iv). Examples of limitations in this domain include, but are not limited to: being easily startled, distracted or over-reactive to sounds, sights, movements or touches; being slow to focus on, or fail to complete activities of interest; becoming repeatedly sidetracked from activities or frequently interrupting others; being easily frustrated and giving up on tasks; and, requiring extra supervision to remain engaged in an activity. *See* 20 C.F.R. § 416.926a(h)(3)(i)-(v). These examples do not describe a specific degree of limitation in this domain. 20 C.F.R. § 416.926a(h)(3).

Here, the ALJ first concluded, with very little discussion, that V.J. had less than a marked

---

limits functioning in the six domains. SSR 09-2p.

19

limitation in the domain of acquiring and using information because her full scale IQ was 80; her teachers reported she was performing at "a one year behind level" and finished work in small groups; and, she never repeated a grade. (Tr. 16.) With regard to V.J.'s functioning in the domain of attending and completing tasks, the ALJ found as follows:

> The claimant has less than marked limitation in attending and completing tasks.
>
> Again, she has an 80 full scale IQ, she is easily distracted, but works better in small groups, and she has never had to repeat a grade. (Exs. 7F, 8F, and 18E).

(Tr. 16-17.) The three exhibits cited by the ALJ (Exhibits 7F, 8F, and 18E) consist of Dr. House's consultative examination report (7F); Ms. Bodman's April 2011 Teacher Questionnaire (8F); and, Ms. Haverdill's December 2011 Teacher Questionnaire (18E). The decision contains no further discussion of this evidence or of this domain.

The Court finds the ALJ has failed to meaningfully analyze V.J.'s functional limitations in the domain of attending and completing tasks. While the ALJ has cited some evidence to support his conclusion that V.J. is not markedly limited in attending and completing tasks, he does not explain how this evidence supports his conclusion. For example, although the ALJ is correct that V.J. scored a full scale IQ of 80 and has never been required to repeat a grade, he does not explain how this evidence necessarily translates to a finding that V.J. has less than a marked limitation in the domain of attending to and completing tasks. Moreover, the decision does not refer to or discuss any other evidence in the record that might support his finding that V.J. had a less than marked limitation in this domain. In fact, the ALJ fails to discuss virtually any of the school-related or medical evidence, including the numerous academic, social, behavioral, and speech/language assessments submitted as part of V.J.'s initial evaluation for

20

IEP and annual IEP reviews.[6]

Moreover, although the ALJ does refer summarily to certain findings in Dr. House's report and the Teacher Questionnaires submitted by Ms. Bodman and Ms. Haverdill, he does not address the numerous statements in those reports that indicate significant concerns regarding V.J.'s ability to focus and maintain attention. For example, the decision fails to acknowledge Ms. Bodman's finding that V.J. has numerous "serious problems" in the domain of attending and completing tasks. (Tr. 393.) Nor does the decision address Ms. Haverdill's assessment that, although V.J. "is able to do the work with a lot of small group/one on one help," she "needs numerous reminders to keep working and refocus" and is "off task quite often." (Tr. 214-217.) The ALJ similarly fails to acknowledge Dr. House's finding that V.J.'s "concentration and attention appear seriously limited." (Tr. 386.)

The Court is aware that an ALJ is not required to discuss each and every item of evidence in the record. *See e.g. Thacker v. Comm'r of Soc. Sec.*, 99 Fed. Appx. 661, 665 (6th Cir. 2004). However, in assessing whether a child has marked or extreme functional limitations in one of the six domains, an ALJ must "provide sufficient detail so that any subsequent reviewers can understand how they made their findings." SSR 09-1p. In the instant case, the ALJ's discussion of V.J.'s limitations in the domain of attending and completing tasks is inadequate. He fails to acknowledge (much less address) the vast majority of the evidence submitted regarding V.J.'s

---

[6] SSR 09-2p recognizes that "IEPs are important sources of specific information about a child's abilities and impairment-related limitations, and provide valuable information about the various kinds and levels of support a child receives." SSR 09-2p. It goes on to observe that "[t]his information about supports children receive can be critical to determining the extent to which their impairments compromise their ability to independently initiate, sustain, and complete activities." *Id.*

limitations in this domain; and, with respect to the evidence he does cite, his references are vague, perfunctory, and incomplete. In short, the ALJ fails either to explain how the evidence cited supports his conclusion that V.J. had less than marked limitations in the domain at issue, or identify evidence that does support it.

The Commissioner, on the other hand, identifies a great deal of evidence which she believes supports the ALJ's conclusion regarding V.J.'s limitations in this domain. As this Court has previously noted, however, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D.Ohio July 31, 2013). *See also Dutkiewicz v. Comm'r of Soc. Sec.*, 2013 WL 6089680 at * 6 (N.D.Ohio Nov.19, 2013); *Hutchinson v. Comm'r of Soc. Sec.*, 2013 WL 4604561 at *14 (E.D.Mich. Aug.29, 2013); *Jury v. Comm'r of Soc. Sec.*, 2013 WL 4427353 at *11 (N.D.Ohio Aug.14, 2013); *Sarchet*, 78 F.3d at 307 ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").

Here, the ALJ failed to sufficiently articulate the basis for his finding that V.J. had less than marked limitations in the domain of attending and completing tasks. Moreover, this portion of the decision is so conclusory and devoid of explanation that it deprives this Court of the ability to conduct a meaningful review.

### *Interacting and Relating with Others*

Jeffery also argues the ALJ failed to provide an adequate analysis of V.J.'s limitations in

22

the domain of interacting and relating with others. This domain considers "how well [the child] initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [her] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(i). With regard to school age children such as V.J., the Agency considers a child's functioning in this domain in the following context:

> When you enter school, you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 CFR § 416.926a(i)(1)(iv). Examples of limitations in this domain, which do not necessarily describe a specific degree of limitation, include having no close friends, or having friends who are all older or younger than then claimant; avoiding or withdrawing from people the claimant knows, or being overly anxious or fearful of meeting new people or trying new experiences; difficulty playing games or sports with rules; difficulty communicating with others, such as in using verbal and nonverbal skills for expression; difficulty speaking intelligibly or with adequate fluency. *See* 20 C.F .R. 416.926a(i)(3)(ii)-(vi).

With respect to this domain, the ALJ concluded as follows:

> The claimant has less than marked limitation in interacting and relating with others.
>
> Initially, I note that Dr. House, the consultative examiner, opined that the claimant had a psychotic disorder (Exh. 7F). However, he based this diagnosis on the claimant's statement that she has an imaginary friend. (Ex. 7F). However, at the hearing, the claimant made note that the friend is imaginary and not real (testimony). Also, on the date of the examination by Dr. House, the claimant had not taken her medication. (Ex. 7F). The state agency psychologist did not find

23

that the claimant had a psychotic disorder (Ex. 4A), and I agree (SSR 96-6p).  The claimant is in speech therapy, but she was able to produce all sounds correctly, on testing. (Ex. 2F).

(Tr. 17-18.)

The Court finds the ALJ has failed to meaningfully analyze V.J.'s functional limitations in the domain of interacting and relating with others.  As noted above, among other things, this domain considers how well a child is able to develop and sustain emotional connections with others.  Although Dr. House's diagnosis of a psychotic disorder may be relevant to this domain and the ALJ provides reasons for rejecting that diagnosis, the decision fails to acknowledge any of the evidence submitted regarding V.J.'s social and emotional problems at school and at home. For example, the ALJ fails to address Ms. Bodman's findings that V.J. had (1) a "very serious problem" in seeking attention appropriately; (2) "serious problems" in playing cooperatively with others, following rules (classroom, games, sports), respecting/obeying adults in authority, and, using language appropriate to the situation and listener; and, (3) "obvious problems" with making and keeping friends, expressing anger appropriately, asking permission appropriately, and, relating experiences and telling stories.  (Tr. 394.)  In addition, the ALJ failed to acknowledge Ms. Haverdill's assessment that V.J. has difficulty getting along with peers and working cooperatively in group situations; is argumentative; and, "often throws 'tantrums' when she doesn't get her own way."  (Tr. 214-217.)  The decision also makes no mention of Jeffery's hearing testimony regarding V.J.'s difficulty sustaining friendships and habit of throwing temper tantrums.  (Tr. 36, 40-42.)

As noted above, the domain of interacting and relating with others also considers how well a child is able to communicate.  Although the ALJ acknowledged V.J. was in speech therapy, he

24

appears to have discounted V.J.'s communication deficits by finding that she "was able to produce all sounds correctly, on testing." (Tr. 18.) While the evidence does indicate V.J. was able to sufficiently articulate speech sounds, the ALJ fails to address any of the evidence regarding V.J.'s difficulties expressing and comprehending language. Indeed, although V.J.'s speech therapist noted V.J.'s "articulation skills are within normal limits," she nonetheless observed that "[i]t is difficult for [V.J.] to get her thoughts and ideas across to others verbally." (Tr. 144.) Nor does the ALJ address V.J.'s consistently poor and/or below average scoring on the Test of Language Development, both at the Primary and Intermediate Levels. As set forth *supra*, V.J.'s performance on these tests, over a period of several years, showed deficits in her overall language skills, including her abilities to get her thoughts and ideas across to others verbally. (Tr. 257-258, 335, 402.)

Although ALJs are not required to discuss each and every item of evidence in the record; *see e.g. Thacker*, 99 Fed. Appx. at 665, they must "provide sufficient detail so that any subsequent reviewers can understand how they made their findings." SSR 09-1p. In the instant case, the ALJ's discussion of V.J.'s limitations in the domain of interacting and relating with others is so deficient that it prevents this Court from conducting a meaningful analysis of the decision.

Accordingly, and for all the reasons set forth above, the Court finds remand is necessary to permit the ALJ an opportunity to more fully explain the basis for his findings that V.J. has less than marked limitations in the domains of attending and completing tasks, and interacting and relating with others.

## VII. Decision

25

For the foregoing reasons, the Court finds the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this Opinion.

IT IS SO ORDERED.

s/ Greg White
United States Magistrate Judge

Date: June 16, 2014